**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

VONDA JONES,

ROCHELLE ST. JOHN,

CHRISTINA DAVIES,

MARIA GARCIA PAGAN,

*on behalf of themselves and all other*
*persons similarly situated,*

               *Plaintiffs*,

    v.

U.S. DEPARTMENT OF LABOR,

LORI CHAVEZ-DEREMER, *in her official*
*capacity as Secretary of Labor*,

EMPLOYMENT AND TRAINING
ADMINISTRATION,

LORI FRAZIER BEARDEN, *in her official*
*capacity as Acting Assistant Secretary of the*
*Employment and Training Administration*,

U.S. OFFICE OF MANAGEMENT AND
BUDGET,

RUSSELL T. VOUGHT, *in his official capacity*
*as Director of the U.S. Office of Management and*
*Budget*,

THE UNITED STATES OF AMERICA,

               *Defendants*.

Case No.

---

<u>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

Plaintiffs Vonda Jones, Christina Davies, Rochelle St. John, and Maria Garcia Pagan, by and through their attorneys, bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure and allege as follows.

**INTRODUCTION**

1.      This case concerns the continued operation of an essential program created by Congress and administered by the Department of Labor program, the Senior Community Service Employment Program (SCSEP). For sixty years, SCSEP has provided grants to states and nonprofits for training and community service-oriented job experiences for unemployed seniors seeking to transition back into the workforce.

2.      For program participants, SCSEP is a lifeline: they gain valuable skills training and experience through part-time, minimum wage work aimed at helping them secure permanent, unsubsidized jobs. And for the communities where participants work, SCSEP is a significant positive benefit: participants contribute thousands of work hours to hospitals, schools, local government agencies, senior centers, and other public and nonprofit organizations in positions that would not otherwise exist.

3.      For more than six decades, the Department of Labor faithfully executed the program. As required by statute, the Department has distributed the money that Congress appropriated for use by states and nonprofits to run the program across the country. These grantees, in turn, provide funds to the local nonprofits and agencies who hire, train, and pay participants.

4.      Through a competitive process, the Department of Labor (DOL) selects national nonprofits grantees to run four-year projects, with each program year of the project running from

July 1 to June 30. Each spring, the Department of Labor issues new awards and releases funds well in advance of the July 1 start of the program year, ensuring that programs continue without interruption. The relevant statutes prescribe formulas for the precise amount of funds that state grantees and national profit grantees must each receive for each project year, and DOL must make these funds available for each grantee to spend in full during the project year.

5.    This year, DOL changed course, upending the program and injecting chaos into the lives of tens of thousands of seniors nationwide whose work was suddenly cut short. In 2024, DOL selected national nonprofits to operate SCSEP programs for the four-year project term prescribed by statute, but this spring, the Department failed to take steps it normally takes to issue new grants to these grantees to continue their four-year projects. Instead, it advised national grantees that it was "reviewing" the funds that Congress appropriated for the project year running from July 1, 2025 to June 30, 2026.

6.    On July 1, 2025, still without funds and hearing nothing more from the Department, SCSEP programs shut down and tens of thousands of seniors nationwide were suddenly furloughed. Without explanation, these vulnerable senior citizens lost their critical work experience, training, and paychecks. For many, this meant falling behind on payments or relying on family members for basic necessities. It deprived them of a sense of meaning and pushed them into social isolation.

7.    Plaintiffs bring this suit on their own behalf and on behalf of the tens of thousands of similarly situated seniors to stave off these incredible harms and require the Department and the Office of Management and Budget to release already-appropriated SCSEP funds to continue four-year SCSEP grants as required by law.

**PARTIES**

8.      Plaintiff Vonda Jones, age 71, is a resident of Lowndes County, Georgia. She has participated in the SCSEP program working as a receptionist at the Georgia Department of Labor since August 2024. On June 27, 205, she was placed on furlough when the Georgia Department of Labor stopped receiving SCSEP funds. Ms. Jones is currently unemployed.

9.      Plaintiff Christina Davies, age 63, is a resident of Paulding, Ohio. She has participated in the SCSEP program at the Pathstone Senior Center in Paulding since October 2023. On June 30, 2025, she was placed on furlough when the Senior Center stopped receiving SCSEP funds. Ms. Davies is currently unemployed.

10.      Plaintiff Rochelle St. John, age 76, is a resident of Mashpee, Massachusetts. She has participated in the SCSEP program at the Mashpee Senior Center since October 2024. On June 30, 2025, she was placed on furlough when the Senior Center stopped receiving SCSEP funds. Ms. St. John is currently unemployed.

11.      Plaintiff Maria Garcia Pagan, age 57, is a resident of Ponce, Puerto Rico. She has participated in the SCSEP program at the Departamento del Trabajo (Department of Labor) in Ponce, Puerto Rico since September 2023. On June 30, 2025, she was placed on furlough when the Department stopped receiving SCSEP funds. Ms. Pagan is currently unemployed.

12.      Defendant U.S. Department of Labor (DOL) is an executive agency of the United States, headquartered in Washington, D.C. DOL is an agency within the meaning of the Administrative Procedure Act (APA). 5 U.S.C. § 551(1).

13.      Defendant Lori Chavez-DeRemer is the Secretary of Labor and is sued in her official capacity.

14.     Defendant Employment and Training Administration (ETA) is the agency within DOL that issues and oversees SCSEP grants. ETA is an agency within the meaning of the APA. 5 U.S.C. § 551(1).

15.     Defendant Lori Frazier Bearden is the Acting Assistant Secretary of ETA and is sued in her official capacity.

16.     Defendant U.S. Office of Management and Budget (OMB) is a federal agency with responsibility for government-wide financial management policies for executive agencies and numerous financial management functions. *See* 31 U.S.C. §§ 503(a), 504. It is part of the Executive Office of the President, *id.* § 501, and maintains its headquarters in Washington, D.C. OMB is an agency within the meaning of the APA. 5 U.S.C. § 551(1).

17.     Defendant Russell T. Vought is the Director of OMB and is sued in his official capacity.

18.     Defendant the United States of America is responsible for the exercise of executive actions by the other named Defendants and all other agencies that are directed to take action with respect to the failure to release SCSEP funds. The United States of America is included as a defendant under 5 U.S.C. § 702 to ensure that the Plaintiffs obtain adequate relief in the event that an injunction is ordered by the Court.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction to adjudicate these claims because this action arises under the laws and Constitution of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

20.     This Court may grant declaratory, injunctive, and other relief pursuant to 28

U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705, 706, and the Court's inherent authority to enjoin federal

officials from acting unlawfully.

21.     Venue is appropriate under 28 U.S.C. § 1391(e) in the District of Massachusetts

because Plaintiff Rochelle St. John resides in this District.

## FACTUAL AND LEGAL BACKGROUND

I.    **For Sixty Years, the Senior Community Service Employment Program (SCSEP) Has Provided Meaningful Employment Opportunities to Low-Income Seniors**

   A. **Background on SCSEP**

22.     In 1965, Congress created the Senior Community Service Employment Program

(SCSEP) to provide unemployed, low-income seniors with meaningful community service jobs

and job training that will lead to permanent employment. *See* Title V of the Older Americans Act

(OAA), Pub. L. 89-73, as amended, Pub. L. 116-131 (2020) (codified at 42 U.S.C. §§ 3056–

3056p).

23.     These employment opportunities are funded by grants from DOL's Employment

and Training Administration to states, territories, and national nonprofit organizations. 42 U.S.C.

§ 3056d. The states and national nonprofits, in turn, award subgrants to local nonprofit and

public entities (known as host agencies) to fund jobs in settings such as schools, libraries, health

care facilities, senior centers, or government agencies. *See* 42 U.S.C. § 3056p(a)(1).

24.     Eligibility for employment in a job funded through the SCSEP program is limited

to individuals who are at least 55 years old, are unemployed, and whose family income is below

125% of the federal poverty guidelines. *Id.* § 3056p(a)(3)(A). Priority enrollment is given to

individuals over the age of 65 or who have a disability, have limited English proficiency, are a

veteran, are at risk of homelessness, or face other statutorily identified barriers to employment. *Id.* § 3056p(b).

25.     For a maximum of four years, *id.* § 3056p(a)(3)(B)(i), participants (often referred to as job seekers) work part-time in their community-service positions, *id.* § 3056p(a)(2), making the highest of federal, state, or local minimum wage, *id.* § 3056(b)(1)(J). Job seekers are eligible to remain in the program beyond four years only if they have a severe disability, are 75 or older, did not receive social security benefits despite meeting the age-eligibility requirements, live in an area with persistent unemployment, or face other hardships. *See id.* § 3056p(a)(3)(B)(ii).

26.     SCSEP funds are used only to create new jobs, not to subsidize job opportunities that would otherwise exist. SCSEP host agencies must use the vast majority (75%, in most cases) of funds on wages and benefits for SCSEP participants, *id.* § 3056(c)(6)(B); and they cannot use the funds to "displace currently employed workers," including by reducing a currently employed workers' hours, or to fill the position of "an individual on layoff," *id.* § 3056(b)(1)(G).

27.     Consistent with the goal of transitioning all job seekers to unsubsidized employment, the participants receive an Individualized Employment Plan to improve their employability. Grantees or host agencies must provide training and other support to help participants reach the goals identified in the plan and monitor progress through reassessments offered, at a minimum, semi-annually. *Id.* § 3056(b)(1)(N); 20 C.F.R. §§ 641.140, 641.535.

28.     The SCSEP program provides critical support for tens of thousands of seniors across the United States each year. In FY 2022, the most recent year where aggregate data is available, SCSEP served 42,764 job seekers. *See* PY 2022 Qtr 2022 Performance Report for SCSEP (07/01/2022–06/30/2023), at Table C, https://perma.cc/5VLP-YM2X. DOL estimated that SCSEP programs would serve approximately 42,265 job seekers over the course of the 2025

program year. *See* FY 2025 Congressional Budget Justification, Employment and Training

Administration, Community Service Employment for Older Americans, at 9,

https://perma.cc/4JXF-3DPD.

29.    Of the FY 2022 job seekers enrolled in SCSEP, 45% were 65 or older, 43% had

attained no more than a high school level education, 64% were homeless or at risk of

homelessness, 25% had a disability, and 15% had severely limited employment prospects

because they lived in areas of persistent unemployment. *See* PY 2022 Qtr 2022 Performance

Report for SCSEP, *supra*, at Table A.

30.    Through SCSEP, job seekers find meaningful community service work

experience and receive training to overcome barriers, allowing them to re-enter or stay in the job

market. And the benefits of this community service job training program extend not only to

participants but also to the communities in which participants live and work. In FY 2024 alone,

SCSEP participants provided nearly 11 million hours of community service to organizations

around the country. *See* Senior Community Service Employment Program, SAM.gov,

https://perma.cc/4DS2-4SX5.

31.    Forty years after its creation, in a 2006 statutory amendment to SCSEP, Congress

underscored the importance of the program, declaring that "placing older individuals in

community service positions strengthens the ability of the individuals to become self-sufficient,

provides much-needed support to organizations that benefit from increased civic engagement,

and strengthens the communities that are served by such organizations." Pub. L. 109-365, § 501

(codified at 42 U.S.C. § 3056n(2)).

**B. Congress Required DOL to Issue Competitive Grants for 4-Year Projects Run by National Nonprofit Organizations**

32.    Under the OAA, DOL must issue two main types of grants to carry out the program: (1) formula grants to States; and (2) discretionary "national grants" to national nonprofit organizations.

33.    The OAA sets forth specific percentages of Congress' annual appropriation for the SCSEP that must be allocated to the state formula grants versus to national grant recipients. 42 U.S.C. § 3056d(a)-(e). Of the Fiscal Year 2025 funds available for SCSEP, roughly $85.86 is allocated for state and territorial grantees and roughly $307 million is allocated for national grantees.

34.    National grants are awarded every 4 years through competitive applications. Each award is provided to support 4-year SCSEP projects providing community service employment and training to job seekers. *Id.* § 3056*l*(a)(1).

35.    Specifically, "the Secretary shall award grants" to national nonprofits, "through a competitive process that emphasizes meeting performance requirements, to carry out [SCSEP] projects … for a period of 4 years." *Id.* The Secretary "may" extend the project for one more year, meaning to a fifth year, if the national grantee "meets the expected levels of performance" set by statute, *id.* § 3056*l*(a)(2).

36.    Competitors for a national grant must show that they are positioned to set up participants for success, both while participants are working in an SCSEP funded position and, subsequently, while they are engaged in unsubsidized employment.

37.    National nonprofit applicants must show that they are "capable of administering a multi-State program," 20 C.F.R. § 641.400(a), because they have the ability to administer a project that, among other considerations, "serves the greatest number of eligible individuals,

giving particular consideration to individuals with greatest economic" or "social need"; "provides employment for eligible individuals" in or near the communities in which they reside and that "contribute[s] to the general welfare of the communit[y]"; "move[s] individuals with multiple barriers to employment … into unsubsidized employment"; and "minimize[s] disruption in services for participants and in community services provided," *see* 42 U.S.C. § 3056*l*(c). And the Secretary may consider any additional criteria that the Secretary determines to be "appropriate in order to minimize disruption in services to participants." *Id.* § 3056*l*(c)(10).

38.    Applicants also must pass a "responsibility test," whereby the Secretary "assess[es] the applicant's overall responsibility to administer Federal funds," *id.* § 3056*l*(d)(1), considering "any information, including the applicant's history with regard to the management of other grants," *id.* § 3056*l*(d)(2).

39.    National grantees—like state grantees—are also subject to robust performance requirements. In particular, while carrying out their 4-year projects, national grantees must meet negotiated performance measures described in the OAA and implementing regulations. *See id.* § 3056k; 20 C.F.R. part 641, subpart G.

40.    The failure of a national grantee to satisfy certain performance levels during a program year is not grounds to terminate the award. Instead, the Secretary "shall provide technical assistance and require such grantee to submit a corrective action plan" detailing "the steps the grantee will take to meet the expected levels of performance in the next program year." 42 U.S.C. § 3056k(d)(2)(B). Only if a national grantee fails to meet performance measures for all four years does it lose eligibility to compete for a grant during the next open competition. *Id.* § 3056k(d)(2)(B)(iii).

41.    The OAA makes clear that each national grant must fund projects that last at minimum for a 4-year term. The law explicitly states that national grants are "to carry out projects under this subchapter for a period of 4 years" and that a fifth year may be added to "such 4-year period with respect to a project." *Id.* § 3056*l*(a). In addition, the OAA requires that the Secretary and each national grant recipient agree to performance metrics "for each of the first 2 program years," and to new performance metrics "for each of the third and fourth program years." *Id.* § 3056k(a)(2)(C).

42.    Although grants are approved for 4-year projects, the national grantees must apply for funding each year out of DOL's annual appropriations. The amount national grantees receive each year is determined by a detailed statutory formula.

**C. Congress Consistently Funds SCSEP Through Annual Appropriations, and Defendants Make Those Funds Available to Grantees before July 1 Each Year**

43.    Congress has consistently appropriated funds for SCSEP in the decades since the program's creation.

44.    In FY 2024, Congress appropriated $405,000,000 to carry out SCSEP, *see* Pub. L. 118-47, Division D, Title I, 138 Stat. 460, 632 (Mar. 23, 2024) ("2024 Appropriations Act"), the same amount it has appropriated for the program since FY 2020, *see* FY 2025 Congressional Budget Justification, at 8.

45.    Congress again appropriated $405,000,000 to carry out SCSEP in FY 2025. *See* Pub. L. 119-4 (Mar. 15, 2025) ("2025 Full Year Continuing Resolution") (continuing funding at the same FY 2024 level in FY 2025).

46.    Congress appropriated funds for SCSEP on a different schedule s from the federal fiscal year. Although the federal fiscal years run from October 1 to September 30, funds

appropriated to carry out SCSEP "shall be available for Federal obligation" by DOL beginning on April 1 of the relevant fiscal year, until June 30 of the following calendar year. *See* 42 U.S.C. § 3056*o*(b). For instance, appropriations for SCSEP in the 2024 Appropriations Act were available for DOL to obligate "for the period April 1, 2024 through June 30, 2025." 38 Stat. 632. In turn, funds appropriated for the program in the 2025 Continuing Resolution are available for DOL to obligate to grantees from April 1, 2025 to June 30, 2026.

47.     The OAA further limits when grantees may obligate and expend the funds they receive from DOL. The "amounts obligated to grantees shall be available for obligation and expenditure by grantees during the program year that begins on July 1 of the calendar year immediately following the beginning of the fiscal year in which the amounts are appropriated and that ends on June 30 of the following calendar year." 42 U.S.C. § 3056*o*(b).  Thus, for the funds appropriated under the 2025 Continuing Resolution, grantees may only obligate *and expend* their grant funds between July 1, 2025 and June 30, 2026. Grantees may not spend their grant funds after June 30, 2026, unless the Secretary "extend[s] the period during which such amounts may be obligated or expended" by a particular grantee upon a determination "that such extension is necessary to ensure the effective use of such funds by such [grantee]." *Id.*

48.     Consistent with these provisions, DOL's grants to national grantees are funded for budget periods that run from July 1 to June 30 each year.

49.     Until this year, DOL has consistently announced the amounts that will be allotted to grantees in the spring of each year, typically in May or early June, through Training and Employment Guidance Letters ("Guidance Letters"). Each Guidance Letter specifies amounts allotted to states, territories, and national grantees and provides a uniform process for

appropriated funds made available to DOL to be released to all grantees well before the start of performance year on July 1.

50.     Prior to this year, DOL has consistently issued grants and released funds to grantees well before July 1, so that grantees may begin obligating and expending funds at the start of the program year on July 1. From 2020 to 2024, for instance, DOL consistently posted Guidance Letters on its website in early May to early June. *See* Guidance Letter No. 20-20, https://perma.cc/PXH4-PQQY (program year 2021) (posted May 6, 2021); Guidance Letter No. 11-21, https://perma.cc/8WXL-5H4R (program year 2022) (posted June 3, 2022); Guidance Letter No. 18-22, https://perma.cc/A56C-X7W9 (program year 2023) (posted May 15, 2023); Guidance Letter No. 13-23, https://perma.cc/2EXH-KCY5 (the start of program year 2024), (posted May 10, 2024).

### D.  OMB Must "Apportion" Funds to DOL to Use for SCSEP Grants

51.     Before a federal agency such as DOL may use appropriations that Congress provided to it, such as SCSEP appropriations, OMB must authorize the agency to spend the funds through a process known as "apportionment."

52.     The Anti-Deficiency Act prescribes the apportionment process. For appropriations that are available for a definite period such as SCSEP appropriations, the President (and by delegation, OMB), must apportion an appropriation "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." 31 U.S.C. § 1512(a). In other words, the purpose of an apportionment is to prevent agencies from spending appropriations too quickly, such that they do not run out of money before the fiscal year ends, which in turn would necessitate asking Congress for a "supplemental appropriation." *Id.* To that end, apportionments may divide an

annual appropriation up into discrete pieces that agencies may spend across certain "months, calendar quarters, operating seasons, or other time periods." *Id.* § 1512(b)(1)(A).

53.    Under the Anti-Deficiency Act, agencies are legally prohibited from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding" the amount apportioned by OMB. *Id.* § 1517(a).

54.    OMB must make apportionments in writing to an executive agency either twenty days prior to the start of the fiscal year for which the appropriations were provided or thirty days after the date of enactment of the appropriations act, whichever is later. *Id.* § 1513(b).

55.    Many apportionments include footnotes. Footnotes designated with the letter "A" impose legally-binding conditions, subject to the Anti-Deficiency Act, on the agency's use of the apportioned funds. *See* OMB Circular No. A-11, §§ 120.1, 120.34, https://perma.cc/H466-36D6.

56.    OMB is required by law to post its apportionments to a publicly available database. *See* Pub. L. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 256-57 (2022); Pub. L. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022). The database is available at https://apportionment-public.max.gov/, and a nonprofit organization has compiled the apportionments posted to that website in a more user-friendly searchable database at OpenOMB.org.

57.    Under the Anti-Deficiency Act, OMB may not hold back appropriations from apportionments unless doing so to establish a "reserve." OMB may establish a reserve only (A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law. 31 U.S.C. § 1512(c). Prior to 1974, the Anti-Deficiency Act had an additional provision allowing broader grounds for establishing reserves, but Congress repealed that provision to "preclude the

President from relying on that Act as authority for implementing policy impoundments." *City of New Haven v. United States*, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987).

58.    Similarly, the Impoundment Control Act of 1974 (ICA) precludes agencies from "withholding or delaying the obligation or expenditure of" appropriated funds and from taking "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). If the Executive Branch wishes to "defer" the expenditure of funds in any of the above manners, it must send a special message to Congress detailing the money to be deferred and the reasons for the deferral. *Id.* § 684.

59.    The ICA provides the same three grounds for deferral as the Anti-Deficiency Act provides for a reserve. "In other words, deferrals are authorized only in those situations in which reserves are authorized under the Antideficiency Act." U.S. GAO, *Principles of Federal Appropriations Law* 2-48 n.56 (4th ed. 2016) ("GAO Redbook"), https://www.gao.gov/legal/appropriations-law/red-book. The ICA does not permit a deferral for policy reasons. *Id.*; 2 U.S.C. § 684(b).

60.    Prior to this year, OMB's apportionment process has made funds available for DOL's obligation on a timeline that has allowed DOL to issue grants and release funds to national grantees well in advance of the start of the July 1 program year when grantees begin expending grant funds.

## II.    In 2024, DOL Awards Grants to National Nonprofits for 4-Year Projects

61.    During the most recent 4-year grant competition, in 2024, the Secretary awarded grants to 19 national nonprofit organizations.

62.    To ensure a smooth transition between the end of the prior 4-year grant period and the start of the new 4-year grant period through a competitive award process, DOL continued the

awards for the 2020-2024 grantees for a four-month transition period from July 1, 2024 to September 30, 2024. *See* Guidance Letter No. 13-23. After selecting grantees through a competitive process, DOL issued awards to 19 national nonprofits for projects running from 2024 to 2028. *See News Release*, U.S. Dep't of Labor, https://perma.cc/C9TV-BU22. The initial awards provided $194 million to each grantee for the remaining 8 months of the 2024 budget period, from October 1, 2024 to June 30, 2025. Each grantee was eligible for a total of $313 million annually for the remaining 3 years of the grant cycle, from 2025 to 2028, subject to the continued availability of appropriated funds. *Id.*

63.     The grant agreements themselves between DOL and each national grantee provided for only a one-year period of performance, not a four-year period of performance. The period of performance provided was originally July 1, 2024 to June 30, 2025.

64.     The 19 national grantees were funded to provide anywhere from 165 to 4,800 employment positions to eligible seniors across the United States in 2024. Guidance Letter No. 13-23, Change 1 (Dec. 30, 2024), https://perma.cc/8UPN-QAWW.

### III.  Plaintiffs Found Purposeful Work in SCSEP Positions Funded by the 4-Year Grants Awarded in 2024

65.     The SCSEP has provided purposeful and needed work for thousands of low-income seniors across the country, including Plaintiffs.

66.     Plaintiff Vonda Jones started work at the Georgia Department of Labor through the SCSEP program in August 2024. After 4 weeks of training, she began her position as a receptionist, working a maximum of 29 hours per week for $7.25 an hour.

67.     The 4 weeks of training provided through SCSEP taught Ms. Jones resume and typing skills, and how to use computer programs that had been updated since she was last in the workforce. Ms. Jones had been putting the training into practice to look for permanent

employment while working in her temporary, SCSEP-funded receptionist position at the Georgia Department of Labor.

68.    The work provided through the SCSEP program gave Ms. Jones a sense of purpose. As a receptionist at the Georgia Department of Labor, Ms. Jones helped other people find resources at the Department of Labor that they needed. She also had opportunities to help others navigate the job search and application process through a Georgia job search portal. She found that she was able to encourage a lot of other people who were having a hard time finding employment in part because of their age.

69.    The work also helped Ms. Jones make ends meet, as she found that her retirement income did not suffice to meet her needs while also helping support her daughter, who was raising kids as a single parent. Funds received through the SCSEP program helped her pay the necessary expense of purchasing a new car when her other car broke down. The extra source of income was especially critical as Ms. Jones struggled to make repairs to her home after hurricane damage in 2023 and 2024. Hurricane Idalia took the roof off of her home when it hit in August 2023. A few months after Ms. Jones finally completed repairs in April 2024, Hurricane Helene hit in September 2024. That hurricane destroyed Ms. Jones' home, and she has been living in temporary housing since then, while looking for funding sources to rebuild it.

70.    Plaintiff Rochelle St. John joined the SCSEP program on October 8, 2024, where she began working as a receptionist at the Mashpee Senior Center in Mashpee, MA. She had been volunteering at the senior center for a year and a half before working there through SCSEP.

71.    Ms. St. John's work kept her busy. The center has thousands of active members. As a receptionist, Ms. St. John would interact with anywhere between 50 to 100 people a day who called or came into the senior center looking for assistance. Her tasks included referring

individuals to community resources, scheduling appointments, assisting individuals with applications for membership to the center, and learning new software programs and entering data.

72.     For Ms. St. John, the social aspect of the position was just as fulfilling as the work itself. The connection with other people was especially important to Ms. St. John, as she had lost her husband a year before joining the SCSEP program.

73.     From October to March, Ms. St. John worked 20 hours a week, making $15 an hour. In March, her hours were cut to 15 per week so that SCSEP funds could stretch through the end of June.

74.     The money Ms. St. John earned through the SCSEP position allowed her to cover expenses for her medication and car and to contribute to living expenses in the home she shares with her daughter.

75.     Plaintiff Christina Davies started working at a senior center in Paulding, Ohio in October 2023. She has worked anywhere from 17 to 25 hours a week, making $10.70 an hour.

76.     Ms. Davies worked where she was needed, which was normally on kitchen duties. She served food to those who came to the senior center, helped pack food for deliveries, and cleared tables and cleaned dishes.

77.     The SCSEP program has helped Ms. Davies make ends meet, including paying for daily insulin strips to treat her diabetes, and allowed her to connect with others socially.

78.     Plaintiff Maria Garcia Pagan joined the SCSEP in September 2023, where she worked as a receptionist in the Department of Labor's labor rights office in Puerto Rico. She was placed in that office because of her background experience in administrative and teaching roles.

par

79.     Before joining the program, Ms. Garcia Pagan experienced three years of unemployment. The SCSEP program was critical to helping her try to reenter the workforce at an older age after several years of unemployment.

80.     While participating in the program and actively looking for unsubsidized work, Ms. Garcia Pagan went through a refresher course on using computer programs such as Word and Excel and received help updating her resume. In her position at the Department of Labor, she was able to help people trying to navigate the process for filing claims against employers or applying for work permission. She also took on a variety of other tasks as needed at the office, including filing forms.

81.     While in the SCSEP program, Ms. Garcia Pagan made $10.50 an hour and typically worked 13 hours a week. These funds allowed her to cover living expenses for her and her 14-year old son without having to rely on her parents for financial support.

## IV.    In 2025, Defendants Inexplicably Withhold Funds for National Grantees to Continue their 4-Year Projects

82.     This year, without explanation, DOL has abandoned the uniform and orderly process for awarding new grants and disbursing funds to all grantees well in advance of July 1, the date on which grantees can start expending funds. Instead, in a haphazard and untimely manner, DOL has issued grants and released funds to state grantees only, while refusing to issue grants and withholding funds to national nonprofit organizations.

83.     This Spring, DOL did not post a Guidance Letter announcing program year 2025 fund allocations to states, territories, and national grantees, as it normally does.

84.     Instead, after months of silence, on July 1, DOL posted a Guidance Letter specific to states and territories only. Guidance Letter No. 16-4 (July 1, 2025), https://perma.cc/WP6C-3D37. The letter states: "This [Guidance Letter] covers the full year grant period for state and

territorial grantees totaling $85,869,039. DOL is still reviewing the remaining $307,072,086

available for national grantees." *Id.* That same day, DOL released the $85,869,039 in funds to

state and territory grantees.

85.    DOL provided no further information about what its purported "review[]" of the

funds made available for national grantees entails, when that "review" will complete, and if or

when it will release funds to national grantees for program year 2025.

86.    While it delayed releasing funds based on its ostensible "review" of appropriated

funds, DOL gave national grantees a one-month extension to the period of performance for their

grants. But DOL did not provide additional funds for those extensions. That meant that national

grantees could continue providing community service employment under their grants until the

end of July (instead of June), 2025—but only if they still had funds available under their grants

for program year 2024.[1]

87.    DOL subsequently provided another no-cost extension to all national grantees,

until September 1, 2025.

88.    DOL has taken no action to issue grants or release the remaining $300 million to

national grantees. As of today, nearly two months after the start of the 2025 program year, DOL

has failed to issue a Guidance Letter making allocations to national grantees, or to release funds

to those grantees.

89.    Publicly available documents relating to OMB apportionments suggest that OMB

has contributed to DOL's withholding of funds.

90.    OMB's apportionments to DOL this year for SCSEP contain an "A" footnote that

places new conditions on DOL's ability to obligate funds apportioned for the SCSEP program.

---

[1] *See* Alicla Wallace, *The Labor Department Has Suddenly Stopped Funding a Senior Job Training Program*, CNN (July 29, 2025), https://tinyurl.com/2bhez3h7.

*See* TAFS 016-0175 2025/2026 - Community Service Employment for Older Americans (Department of Labor), https://perma.cc/5UFU-HDF8 ("SCSEP Apportionment"). Specifically, the A footnote in the SCSEP apportionments provides that the "[a]mounts appropriated" for the program, "but not yet obligated as of the date of th[e] apportionment, are available for obligation consistent with the latest agreed-upon spending plan for Fiscal Year 2025 between [DOL] and [OMB]." *See* SCSEP Apportionment (footnote A1). The footnote further provides that any spending plan "shall include the amounts allocated for formula and competitive grants, as well as how such spending plan aligns with Administration priorities," and that, absent agreement by OMB to the spending plan, "DOL may obligate funds" for SCSEP "only as necessary for payments otherwise required by law." *Id.*

91.    In other words, while OMB has issued an apportionment for SCSEP, it has precluded DOL from actually using the funds unless and until OMB agrees to the contents of a "spending plan" that "include[s] the amounts allocated for formula and competitive grants" and "aligns with Administration priorities." *Id.*

92.    Upon information and belief, OMB previously has not conditioned how funds may be spent on the contents of a spending plan approved by OMB, as the new A footnote for the SCSEP apportionment does.

93.    The apportionment does not reveal whether there currently exists an agreed-upon spending plan that allows DOL to obligate funds to SCSEP national grantees and that "aligns with Administration priorities."

## V.    Plaintiffs Are Harmed By Defendants' Withholding of SCSEP Funds

94.    Defendants' unexplained departure from their prior policy of disbursing funds to national grantees in advance the program year, and entirely withholding funds for those

grantees, has caused substantial disruption to SCSEP programs and the lives of the economically insecure seniors the programs employ.

95.     Without receipt of these federal funds, which were appropriated specifically to fund these jobs programs, national grantees have not been able to continue employing participants. Large national grantees, which together support tens of thousands of participants each year, have had to furlough participants absent receipt of appropriated funds. For example, the AARP Foundation, Goodwill Industries, National Council on Aging, National Able Network, Easterseals, and CWI Works[2] have all placed program participants on furlough pending receipt of appropriated funds.

96.     Across national grant funded programs, approximately 30,000 individuals have been furloughed as a result of the withholding of these funds.

97.     These furloughs are having immediate, detrimental effects on program participants, both financially and personally.

98.     Ms. Jones, for example, was relying on the additional income through SCSEP to make her car payments and provide for her other temporary housing needs while at the same time looking for extra resources to rebuild her home that was destroyed by Hurricane Helene. Ms. Jones is also trying to help her daughter, a single parent, with some expenses. Her retirement income does not suffice to cover all of her and her daughter's needs.

---

[2] *See, e.g.*, *Paid Job Training Through Community Service*, AARP Foundation, https://perma.cc/A9XH-4L78; Rebecca Rainey, *Senior Job Training Funds Cut Ahead of Benefit Work Mandates*, Bloomberg Law, https://news.bloomberglaw.com/daily-labor-report/senior-job-training-funds-cut-ahead-of-benefit-work-mandates; *SCSEP Program Pause - (National) Update 8.21.25*, National Able Network, https://perma.cc/8BFW-DKWU; Alicia Wallace, *The Labor Department has suddenly stopped funding a senior job training program*, CNN, https://www.cnn.com/2025/07/29/economy/senior-job-training-funding-ends.

99.     At the same time, Ms. Jones is devastated at the loss of the opportunity through the Georgia Department of Labor receptionist position to serve other people in need of assistance with their own job search. Having an outlet to encourage others in their struggles kept Ms. Jones from focusing too much on her own difficult situation.

100.    Although Ms. Jones is searching for other work, she has not yet found other employment. In the meantime, she is suffering from the loss of funds and extra support provided by the SCSEP program to successfully transition her to a permanent position that will provide the income she needs to assist herself and her daughter.

101.    Ms. Davies, who has diabetes, never worried about being able to afford her medicine while she was working in the program. Now, she does not have enough money to buy sufficient strips to test her blood each day as required.

102.    Ms. Davies lives with her sister and struggles with feelings of guilt because she is not able to contribute financially. She also misses her work at the local senior center, where she would meet new people while knowing that she was helping.

103.    Similarly, since the furlough, Ms. St. John has had to rely on her daughter for financial support. She is no longer able to contribute financially to living expenses in the home she shares with her daughter.

104.    During the furlough, Ms. St. John has not been allowed to volunteer at the senior center where she had been working through SCSEP and where she volunteered for over a year prior to joining the SCSEP program. In addition to stripping her of income, the furlough has taken away her social outlet and her sense of purpose.

105.    Since the furlough, Ms. Garcia Pagan has had to rely on her parents to financially support her and her 14-year old son. She has experienced intense stress and anxiety over paying bills and is struggling to find unsubsidized employment.

106.    Ms. Garcia Pagan is also experiencing social isolation and a loss of purpose. The SCSEP job experience gave her a reason to leave the home and do something helpful for others every day.

## CLASS ALLEGATIONS

107.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and all similarly situated individuals.

108.    Plaintiffs seek to represent the following class ("Proposed Class"): all unemployed individuals who were engaged in SCSEP programs funded through grants to national nonprofits under 42 U.S.C. § 3056d(d) as of June 30, 2025.

109.    The Proposed Class satisfies each of the requirements of Rule 23(a) and Rule (23)(b)(2).

110.    The Proposed Class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). The class would include tens of thousands of individuals. On June 30, at the end of the 2024 program year, approximately 30,000 individuals across the country were actively participating in the SCSEP program through grants to national nonprofits.

111.    The Proposed Class's claims turn on common questions of law and fact, meeting the requirements of Fed. R. Civ. P. 23(a)(2). The members of the Proposed Class face harm from a common fact: Defendants' failure to make grant funds available for obligation by national grantees beginning on July 1, 2025 as statutorily required. The legality of Defendants' failure to make these funds available is a common question capable of resolution in a single stroke.

112.    Plaintiffs' claims are typical of the claims of the class, meeting the requirements of Fed. R. Civ. P. 23(a)(3). Each Plaintiff and class member's claims arise from the same course of conduct—the withholding of funds—and each face the same injury—loss of employment under the national grant programs under the SCSEP program.

113.    Plaintiffs will fairly and adequately represent the Proposed Class, meeting the requirements of Fed. R. Civ. P. 23(a)(4). Each Plaintiff is committed to seeking a declaration and injunction that will benefit all members of the Proposed Class equally, declaring the withholding of funds to national grantees under the SCSEP program illegal, and seeking immediate compliance with statutory program obligations. Plaintiffs are aware of their obligations as class representatives and are willing to dedicate time and effort to pursue this matter on behalf of every member of the Proposed Class.

114.    The attorneys representing the Proposed class include attorneys with significant experience in appropriations, administrative, and constitutional law, as well as attorneys with class action experience.

115.    The Proposed Class satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Proposed Class and final injunctive and declaratory relief is appropriate to address the injuries of the members of the Proposed Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### APA – ARBITRARY AND CAPRICIOUS AGENCY ACTION
### 5 U.S.C. § 706(2)(A)
### (All Defendants)

116.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

117.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

118.    DOL maintained a long-time policy of releasing funds for national grantees well in advance of July 1 for each of the four years of their four-year project, for use by the national grantees at the start of the program year on July 1.

119.    DOL has now adopted a new policy, and has implemented the policy, of not releasing funds to national grantees in advance of July 1 of a project year, deciding instead that it will conduct an indeterminate "review" of the funds made available for national grants through congressional appropriations and OAA formula allocations.

120.    DOL has also adopted a new policy, and has implemented the new policy, of not continuously maintaining SCSEP programs provided by national grantees during the 4-year project period following the awarding of new national grants pursuant to a competitive process.

121.    DOL's new policies, and their actions implementing those policies, constitute final agency action reviewable under 5 U.S.C. § 704.

122.    DOL's actions are arbitrary and capricious because, among other things, the Department has provided no explanation, much less a reasoned explanation, for its new policies. DOL failed to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [its] decision[s], 'including a rational connection between the facts found and the choice[s] made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

123.    DOL's actions are also arbitrary and capricious because they are substantively unreasonable. *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) (distinguishing between claims that agency action "was

substantively unreasonable" and claims that "the agency has failed to adequately address all of the relevant factors or to adequately explain its [decision]").

124.    DOL's actions are also arbitrary and capricious because DOL did not acknowledge that it was changing policies, *see FCC v. Fox Television Stations*, 566 U.S. 502 (2009), and because DOL failed to consider the reliance interests of the SCSEP participants who rely on the community service employment opportunities provided through national grants. *See Dep't of Homeland Sec'y v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). DOL's July 1 announcement that it was conducting an indeterminate "review[] [of] the remaining $307,072,086 available for national grantees" did not address the fact that tens of thousands of low-income seniors who face barriers to employment—many of whom are disabled, live in areas with highly limited job opportunities, or are at risk of becoming homeless—would lose meaningful community service jobs and training opportunities that help them transition to unsubsidized employment.

125.    OMB's actions are also arbitrary and capricious.

126.    OMB's inclusion of a binding footnote in its apportionments to DOL for SCSEP, which prohibits DOL from using the appropriations for SCSEP unless OMB approves a "spending plan" and which restricts DOL to using the funds only in accordance with the spending plan, constitutes final agency action reviewable under 5 U.S.C. § 704.

127.    OMB's inclusion of the apportionment footnote is arbitrary and capricious. OMB did not provide a reasoned explanation for the footnote. The sole explanation that OMB provided is that "[a]n agency spend plan or other documentation is necessary to better understand how the agency intends to obligate some or all of the apportioned funds." But that does explain why OMB required *OMB's own approval* of the spend plan. OMB also did not acknowledge that

the footnote constitutes a change in agency policy, and OMB did not consider the serious

reliance interests of SCSEP recipients impacted by the footnote's effects.

128.    To the extent that OMB has refused to agree to a spend plan, or has agreed to a

spend plan that prohibits or restricts DOL in providing funds to the national grantees, that

constitutes final agency action that is arbitrary and capricious. Such action has not been

explained and does not consider the facts that Congress required OMB to consider in

apportioning funds, and OMB has not acknowledged the reliance interest at stake.

**COUNT II**
**APA – AGENCY ACTION CONTRARY TO LAW AND IN EXCESS OF STATUTORY**
**AUTHORITY**
**5 U.S.C. § 706(2)(A), (C)**
**(DOL, DOL Secretary Chavez-DeRemer, ETA,**
**ETA Acting Assistant Secretary Bearden, and USA)**

129.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of

the preceding paragraphs.

130.    The APA provides that a court "shall" "hold unlawful and set aside agency

action" found to be "not in accordance with law" or "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

131.    Defendants' decisions to not to disburse funds to the national nonprofit

organizations in advance of the July 1 start of a project year, and to not continuously maintain

SCSEP programs provided by the national organization during the 4-year project period,

violates the statutes authorizing the SCSEP grant program and congressional appropriations.

132.    Congress appropriated $405,000,000 for the SCSEP program that "*shall* be

available for the period" April 1, 2025 through June 30, 2026. *See* Pub. L. 118-47, 138 Stat. 632

(emphasis added); Pub. L. 119-4, 139 Stat. 11.

133.    The OAA requires DOL to make grants and allot appropriated funds for grants to national nonprofits for 4-year projects, subject to a statutory formula.

134.    Title V of the OOA provides that "[t]he Secretary *shall* make the grants" to public and nonprofit private agencies and organizations "from allotments made under section 3056d of [Title V of the OAA], and in accordance with section 3056*l* of [Title V of the OAA]." 42 U.S.C. § 3056(b)(1) (emphasis added).

135.    Under section 3056d, "[t]he funds appropriated to carry out" SCSEP "for any fiscal year that remain after amounts are reserved" as prescribed by 3056d(a), "*shall* be divided by the Secretary between national grants and grants to the States" according to a detailed formula. *Id.* § 3056d(c) (emphasis added). And "[f]rom funds available under subsection (c) for national grants, the Secretary *shall* allot for public and nonprofit private agency and organization grantees" amounts determined by the statutory formula. *Id.* § 3056d(d) (emphasis added).

136.    Under section 3056*l*, "[f]rom the funds available for national grants under section 3056d(d) …, the Secretary *shall* award grants … through a competitive process … to carry out projects … for a period of 4 years," subject to a discretionary one-year extension. *Id.* § 3056*l*(a) (emphasis added).

137.    OAA also provides when funds must become available for use by grantees: "amounts obligated to grantees shall be available for obligation and expenditure by grantees during the program year that begins on July 1 of the calendar year immediately following the beginning of the fiscal year in which the amounts are appropriated and that ends on June 30 of the following calendar year." *Id.* § 3056*o*(b). In other words, DOL must make funds available for grantees to obligate and expend between July 1 and June 30 during each program year.

138.    DOL has no discretion to decline to provide funds appropriated for national nonprofit organizations that win competitive awards for 4-year projects. DOL must provide to state and national grantees all the funds remaining from each fiscal year appropriation after making certain reservations according to the specific formula set by Congress. *Supra*. And national grantees must receive funds for each year of the 4-year projects for which they have been awarded a grant.

139.    Congress left DOL no discretion to exercise an indeterminate "review" of appropriated funds to determine when or whether to disburse the funds made available for national grants under OAA's detailed statutory formula.

140.    DOL's failure to make grants and allot funds for national grants with 4-year awards violates the OAA and appropriations statutes by, among other things,

   a.   Not making grants and allotting funds to national nonprofit organizations before the July 1 start of the program year;

   b.   Not making grants and allotting funds to national nonprofits unless and until completing an indeterminate "review" of the appropriated funds; and

   c.   Not making grants and allotting funds, as a ministerial matter and according to the statutory formula, to national nonprofit organizations with approved 4-year projects during each year covered by the 4-year project.

**COUNT III**
**APA – AGENCY ACTION CONTRARY TO LAW AND IN EXCESS OF STATUTORY**
**AUTHORITY**
**5 U.S.C. § 706(2)(A), (C)**
**(OMB, OMB Director Vought, and USA)**

141.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

142.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A), (C).

143.    OMB's inclusion of its binding footnote in its apportionment to DOL, which precludes DOL from obligating funds unless and until OMB agrees to a spend plan, violates the relevant appropriations acts, the OAA, and the Anti-Deficiency Act.

144.    Congress appropriated $405,000,000 for the SCSEP program that "*shall* be available for the period" from April 1, 2025 through June 30, 2026. *See* Pub. L. 118-47, 138 Stat. 632 (emphasis added); Pub. L. 119-4, 139 Stat. 11.

145.    Under the OAA, appropriations to carry out SCSEP "*shall* be made available for Federal obligation during the annual period that begins on April 1 of the calendar year immediately following the beginning of such fiscal year and that ends on June 30 of the following calendar year." 42 U.S.C. § 3056*o*(b) (emphasis added). In other words, OMB must make funds available for obligation by DOL to grantees from April 1 to June 30 each year.

146.    OMB violated and is violating the 2025 Full Year Continuing Resolution and the OAA by not making the appropriated funds available for DOL to obligate during the time period that began on April 1, 2025.

147.    Under the Anti-Deficiency Act, the sole purpose for which OMB must apportion funds of a definite period is to "prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." 31 U.S.C. § 1512(a). OMB may apportion funds across different time periods, or across different "activities, functions, projects, or objects," or some combination thereof, *id.* § 1512(b), but the purpose of apportioning funds is these manners must be to prevent agencies from obligating their funds in a

manner that would "indicate a necessity for a deficiency or supplemental appropriation." *Id.* §
1512(a). Similarly, although OMB has discretion to apportion funds as it "considers
appropriate," *id.* § 1512(b)(2), that discretion may only be exercised within the confines of
preventing the need for a deficiency or supplemental appropriation. *Id.* § 1512(a). OMB's
inclusion of a footnote that conditions DOL's use of funds on OMB's approval on a spend plan
is not a permissible use of apportionment authority, because OMB did not include this
requirement to prevent the need for a deficiency or supplemental authorization.

148.    OMB's inclusion of the footnote independently violates the Anti-Deficiency Act
by violating 31 U.S.C. § 1513(b). That provision requires OMB to apportion an appropriation to
an agency no later than 30 days after enactment of an appropriations law. OMB violated that
requirement by apportioning funds in a manner that prohibited DOL from using the funds at all,
without further action by OMB, which is functionally the same as not apportioning the funds.
OMB cannot circumvent § 1513(b) by apportioning money but dictating that an agency may not
use any of it.

149.    OMB's inclusion of the footnote independently violates the Anti-Deficiency Act
by establishing a reserve for impermissible reasons and without conveying a special message to
Congress. *See* 2 U.S.C. §§ 682(1)(A), 684(a); 31 U.S.C. § 1512(c).

**COUNT IV**
**APA – AGENCY ACTION UNLAWFULLY WITHHELD OR**
**UNREASONABLY DELAYED**
**5 U.S.C. § 706(1)**
**(all Defendants)**

150.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of
the preceding paragraphs.

32

151.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

152.    The OAA imposes a mandatory duty that the Secretary "shall award grants . . .  to carry out projects . . . for a period of 4 years." 42 U.S.C. § 3056*l*(a)(1). The Secretary has unlawfully withheld agency action necessary for national grantees to carry out projects over a continuous 4-year period. At a minimum, the Secretary's failure to take such actions constitutes agency action unreasonably delayed.

153.    The OAA further imposes a mandatory duty that the funds appropriated for SCSEP "shall be divided by the Secretary between national grants and grants to States" pursuant to specific formulas, that certain aggregate amounts determined by the formulas "shall be provided to grantees that operate under this subchapter under national grants from the Secretary," and that "the Secretary shall allot for" for national grantees in each state a particular amount determined by a formula that incorporates the number of persons over 55 years old in each state. 42 U.S.C. § 3056d(c)-(d). The Secretary's failure to take these actions represent agency action unlawfully withheld. At a minimum, the Secretary's failure to take such actions constitutes agency action unreasonably delayed.

154.    The OAA also imposes a mandatory duty on Defendants that SCSEP appropriations "shall be available for obligation and expenditure by grantees during the" program year that runs from July 1 to June 30. 42 U.S.C. § 3056*o*(b). Defendants' failure to take actions necessary to make the funds available to national grantees for the period beginning on July 1, 2025, constitutes agency action unlawfully withheld. At a minimum, Defendants' failure to obligate funds to national grantees, and the failure to make such obligated funds become "available for obligation and expenditure by grantees during the" program year that runs from

July 1 to June 30, represents agency action unreasonably delayed. National grantees may only obligate *and expend* their allocation of funds for this program year until June 30, 2026. Until now, national grantees have had the entire program year to expend the full amount of funds allotted to them. The delay in providing funds to national grantees until well into the program year makes it difficult, if not impossible, to expend their full allocation of funds by June 30, 2026. The delay also unreasonably prevents program beneficiaries from timely receiving SCSEP benefits during the program year.

155.    OMB has a mandatory duty to apportion funds to DOL at a rate "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." OMB also has a mandated duty to apportion SCSEP funds no later than 30 days after the enactment of the relevant appropriations act. OMB's failure to take such actions constitutes agency action unlawfully withheld, or, at a minimum, unreasonably delayed.

### COUNT V
### MANDAMUS ACT AND ALL WRITS ACT
### 28 U.S.C. §§ 1361, 1651
### (all Defendants except USA)

156.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

157.    If complete relief is not available on the other Counts in this complaint, Plaintiffs have no adequate remedy other than mandamus.

158.    The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

159.    The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

160.    Defendants have the mandatory duties set forth above.

161.    It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants to carry out their mandatory duties.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Certify the Proposed Class;

B.    Declare unlawful and set aside DOL's and OMB's unlawful and arbitrary and capricious final agency actions;

C.    Compel Defendants to take all agency actions unlawfully withheld or unreasonably delayed;

D.    Preliminarily and permanently enjoin:

      i.    OMB and Director Vought to make available to DOL for its obligation all FY 2025 appropriations, in the amounts and at the times necessary to enable national grantees to maintain their projects, and obligate and expend their allocated funds, during the program year July 1, 2025 to June 30, 2026;

      ii.    DOL, ETA, Secretary Chavez-DeRemer, and Acting Assistant Secretary Bearden to immediately make or maintain grants for national grantees, take all actions necessary to enable national grantees to carry out their projects for a continuous 4-year period, obligate and allot to national

grantees collectively and individually their statutorily prescribed
allocations of the funds appropriated for SCSEP according to the statutory
formulas in 42 U.S.C. § 3056d; and enable national grantees to obligate
and expend their allocation of funds during program year July 1, 2025 to
June 30, 2026.

E.      Award Plaintiffs reasonable fees, costs, and expenses, including attorneys' fees;
and

F.      Award such additional relief as this Court may deem just and proper.


Dated: September 18, 2025                    Respectfully submitted,

                                             */s/ Kali Schellenberg*
                                             Kali Schellenberg (MA BBO No. 694875)
                                             Steven Y. Bressler (D.C. Bar No. 482492)[+]
                                             Democracy Forward Foundation
                                             P.O. Box 34553
                                             Washington, D.C. 20043
                                             (202) 448-9090
                                             kschellenberg@democracyforward.org
                                             sbressler@democracyforward.org

                                             */s/ Daniel F. Jacobson*
                                             Daniel F. Jacobson (D.C. Bar No. 1016621)[+]
                                             Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
                                             Kyla M. Snow (D.C. Bar No. 90036400)[+]
                                             Jacobson Lawyers Group PLLC
                                             1629 K Street NW, Suite 300
                                             Washington, DC 20006
                                             (301) 823-1148
                                             dan@jacobsonlawyersgroup.com

                                             *Counsel for Plaintiffs*

                                             [+] Pro Hac Vice Forthcoming